IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2024

IN RE ANTONIO P. ET AL.

**Appeal from the Juvenile Court for Davidson County**
**Nos. PT265278, PT272638          Sheila Calloway, Judge**

_____

**No. M2023-01260-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to two of her minor children on the grounds of abandonment by failure to visit, substantial noncompliance with the permanency plans, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the children. We affirm the trial court's ruling on all grounds. We also conclude that terminating the mother's parental rights is in the children's best interests and affirm the trial court's ultimate ruling.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Brittany S.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights in order to protect their privacy and identities.

# OPINION

## BACKGROUND

Brittany S. ("Mother") appeals the termination of her parental rights to two of her minor children, Antonio P. and Au'brie P.[2] (together, the "Children"). Antonio P. was born in June 2019, and Au'brie P. was born in May 2020 to Mother and Antonio P., Sr. ("Father")[3] (together, the "Parents"). On May 13, 2020, the Tennessee Department of Children's Services ("DCS") filed a Petition for Custody with Request for Emergency Removal and Request to Set Child Support (the "Custody Petition") in the Davidson County Juvenile Court (the "trial court"). The Custody Petition averred that DCS was notified on May 6, 2020 that Mother used cocaine and Lortab[4] during her pregnancy with Au'brie P. and that Au'brie P.'s urine drug screen performed shortly after her birth was positive for cocaine. It further stated that Mother denied using cocaine but admitted taking Lortab during the final weeks of her pregnancy leading up to Au'brie P.'s birth. The Custody Petition also alleged that Mother stated Father occasionally put cocaine into his cigarettes, and she may have accidentally smoked one a few days before delivering Au'brie P. Moreover, DCS averred that a Child Protective Services Investigator ("CPSI") administered a urine drug screen to Mother, and she tested positive for oxycodone. The Custody Petition asserted that Father admitted he would occasionally put cocaine in cigarettes, and he refused to participate in a urine drug screen. DCS stated that it attempted to obtain an Immediate Protection Agreement, but all the potential placements identified by the Parents were inappropriate due to the potential placements' criminal history and/or history with DCS.

The trial court entered an Emergency Protective Custody Order on May 13, 2020, finding probable cause to believe that the Children were dependent and neglected and subject to an immediate threat to their health and safety if left in the Parents' custody. The trial court placed the Children in the temporary custody of DCS where they have remained since that time. On September 17, 2021, the trial court held a hearing on the Custody Petition. The trial court found that Au'brie P.'s urine screen at birth and umbilical screen were both positive for cocaine. Despite this, the trial court declined to make a severe abuse finding as to Au'brie P., finding instead that Mother's cocaine use "was the result of reckless behavior in using a cigarette [that Mother] had knowledge could be laced with cocaine, rather than current proof of ongoing cocaine use." It did, however, find that the

---

[2] The record contains multiple spellings of this child's first name. We spell her name as it appears on her birth certificate.

[3] Father's parental rights have also been terminated, but he has not appealed that decision and his rights are not at issue. Father is mentioned only for context.

[4] Lortab is the brand name for a medication containing hydrocodone, an opioid pain reliever.

Children were dependent and neglected as defined by Tennessee Code Annotated section 37-1-102(b)(13)(F) and (G), due to the Parents' drug use.

On August 12, 2021, DCS filed a Petition to Terminate Parental Rights (the "Termination Petition") in the trial court. DCS alleged that multiple grounds existed for the termination of Mother's parental rights, including abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody of the Children. DCS also argued that it was in the Children's best interests that Mother's parental rights be terminated.

Family Permanency Plans were adopted in June 2020 and January 2021. Both permanency plans required Mother to, *inter alia*, "obtain and maintain a legal source of income and provide proof to DCS[;]" "continue to maintain contact with DCS and notify [DCS] within 10 days of any change in contact information[;]" "obtain and maintain safe and stable housing[;]" "sign a release for DCS to get [alcohol and drug] records from" the mental health treatment center that Mother reported she attended; "submit to random drug screens[;]" "demonstrate the ability [] to parent [the Children] with a drug free life style[;]" "complete a parenting assessment and follow all recommendations and provide proof of completion to DCS[;]" "complete a mental health assessment and follow all recommendations[;]" "sign a release for mental health records[;]" and "have a minimum of 4 hours of supervised visitation with" each of the Children. Prior to trial, Mother completed a required drug and alcohol assessment, a mental health assessment, and claims to have signed a release allowing her treatment providers to provide DCS her medical records, but she did not complete any of the recommendations resulting from the drug and alcohol assessment. Mother participated in some sessions with a mental health counselor but discontinued that treatment. Mother also completed a parenting assessment with the Family Center and took a positive parenting class. However, she did not provide any proof of income. Furthermore, while she has lived in the same apartment for several years, she has not provided any proof that she is on the lease for the apartment.

A trial was held on May 1, 2023 and May 2, 2023, at which Mother,[5] Father, a DCS Case Manager, the Children's foster mother ("Foster Mother"), a DCS Team Leader ("DCS Team Leader"), and Mother's stepmother, Stephanie A., testified. Foster Mother testified that, during the four-month period immediately preceding DCS's filing of the Termination Petition, Mother exercised a total of two visits with the Children, both of which ended

---

[5] Mother attended only the first day of trial in person. Her attorney stated that Mother was unable to attend the second day of trial in person due to anxiety. Mother attempted to attend the second day of trial by phone, but her phone continuously disconnected.

earlier than scheduled.[6] The first visit occurred in May 2021; it was scheduled for one hour but lasted only five minutes before being voluntarily terminated by Mother. The second visit occurred in June 2021; it lasted only two minutes before being terminated by DCS due to a verbal outburst by Mother directed at Foster Mother. On appeal, Mother alleges that DCS did not properly document her visits and suggests there may have been additional visits. However, the record does not contain any proof of additional visits. Conversely, the DCS Team Leader testified that Mother had many more visits scheduled with the Children but only attended approximately 10% of the scheduled visits. After the June 2021 visit, Mother's visitation rights were suspended due to her behavior, and Mother never completed the steps necessary to regain her visitation rights.

Mother also testified that she was incarcerated in February 2023 for missing a court date in a separate criminal matter. In that case, Mother is charged with five misdemeanors and one felony, all for shoplifting.[7] Mother adamantly denies using any drugs since 2017 and does not believe that she has a problem with drug use. Mother denies any positive drug tests and accuses DCS case workers of falsifying her multiple positive drug tests. Mother most recently lost custody of another child in March of 2023, at which time she tested positive for THC and cocaine. Mother has previously worked at Taco Bell but lost that job due to her February 2023 incarceration and was unemployed at the time of trial. Finally, Mother testified that termination was not in the Children's best interests because they are her children and require the presence of their biological family and surroundings.

At the conclusion of the trial, DCS voluntarily dismissed the grounds of abandonment by failure to provide a suitable home and severe child abuse. The trial court found that DCS met its burden of proof as to abandonment by failure to visit, substantial noncompliance with the Permanency Plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. The trial court entered its final order on August 9, 2023, finding that it is in the best interests of the Children for Mother's rights to be terminated. Mother timely appealed to this Court.

## ISSUES

Mother raises the following issues on appeal, which we restate slightly:

1. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that Mother abandoned the Children by failing to visit.

---

[6] Due to the COVID-19 pandemic, each of these visits was scheduled to occur by phone or videoconference.

[7] Those charges were still pending in August 2023 when the trial court entered the judgment in this case.

2. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that Mother was in substantial noncompliance with the reasonable responsibilities of the Permanency Plan.

3. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that the conditions that led to the Children's removal still exist.

4. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that Mother failed to manifest an ability and willingness to assume custody of or financial responsibility for the Children.

5. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that terminating Mother's parental rights is in the Children's best interests.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL

4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

## I.   Grounds for Termination

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) at least one statutory ground for termination of parental and guardianship rights has been established, and (2) termination is in the best interests of the child. *See* Tenn. Code Ann. § 36-1-113(c). Here, the trial court found that DCS proved four grounds for termination, and we review each ground in turn.

## A. Abandonment by Failure to Visit

Tennessee Code Annotated section 36-1-113(g) provides that abandonment, as defined in section 36-1-102, is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2021).[8] Section 36-1-102 provides that abandonment occurs, among other instances, when

---

[8] In termination cases, we apply the version of the statute in effect at the time the petition to terminate was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). Accordingly, all references herein are to the version of the Tennessee Code Annotated that was in effect on August 12, 2021.

- 6 -

[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Abandonment by failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" *Id.* § 36-1-102(1)(C).

In the present case, the salient time period for Mother's failure to visit is April 11, 2021 to August 11, 2021.[9] The record demonstrates that Mother visited with the Children only twice during this four-month period and that those visits lasted approximately five minutes and approximately two minutes, respectively. On appeal, Mother argues that DCS failed to correctly document exactly when she was visiting or not visiting during the relevant four-month period and thus failed to provide sufficient proof that she did not have more visits with the Children during this relevant period. In support of this argument, Mother notes that she testified at trial that "early on" during the custodial period, she had additional videoconferences with the Children. She also points to testimony of the DCS Team Leader that no records were in DCS's tracking system of Mother having "regularly-scheduled visitations." Finally, Mother relies on the DCS Team Leader's testimony that DCS also had communications with Mother by text and email that are not recorded in DCS's tracking system.

Upon our diligent review of the record, we conclude that the records kept by DCS are consistent with Foster Mother's trial testimony. Foster Mother testified that Mother attended only two videoconference visitations during the relevant four-month period, one in May of 2021 and a second in June of 2021. Although other visits were scheduled to occur, Foster Mother testified that Mother did not attend those other visits. Additionally, the visits that did occur lasted only two to five minutes, and the last visit was ended by the social worker due to Mother's verbal outburst toward Foster Mother during the visit. Further, the record reflects that when there was an opportunity for Mother to participate in

---

[9] *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that for purposes of abandonment, the four-month period "includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed").

visitation in person with the Children in late 2021, Mother became unreachable. Moreover, as best we can discern, the purported lack of documentation that may have occurred when the Children first came into DCS custody pre-dates the relevant four-month period. Finally, the exhibits that Mother points to in her brief establish that during the relevant four-month period, Mother was frequently not reachable due to her contact information being inactive and outdated.

Although two visitations occurred within the relevant four-month period, these visits were mere token visits. They lasted no more than five minutes and, as a result, were of such a "short duration as to merely establish minimal or insubstantial contact with the [C]hild[ren.]" Tenn. Code Ann. § 36-1-102(1)(C).

Accordingly, we agree with the trial court that this ground was proven by clear and convincing evidence as to Mother.

### B. Substantial Noncompliance with Permanency Plan

Parental rights may be terminated for "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground is not established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

In this case, the trial court found that there was substantial noncompliance with the permanency plan. Specifically, it found:

Although Mother completed an alcohol and drug assessment, a parenting assessment, and a mental health assessment, she has not completed the recommendations from the assessments. Furthermore, Mother has recently tested positive for [a] controlled substance for another child. Mother has not been able to continue with her visitation with the [C]hildren due to her behaviors. Mother has also not provided proof of income or stable housing. Therefore, there are grounds to terminate both parents' rights due to the substantial noncompliance with the permanency plan.

We agree with the trial court that this ground was proven by DCS through clear and convincing evidence.

First, this Court finds that the permanency plan was "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Carrington H.*, 483 S.W.3d at 537 (quoting *In re Valentine*, 79 S.W.3d at 547). The Children were originally removed from Mother and placed in DCS custody due to Au'brie P. testing positive for cocaine when she was born and Mother's admitted use of Lortab during her pregnancy. The record establishes that the family lived a lifestyle that included drug use, and the requirements in the plan address that. For example, the plan required that Mother establish a stable living situation, undergo an alcohol and drug assessment, undergo a mental health assessment, demonstrate the ability to parent the Children with a drug-free life style, submit to random drug testing, sign a release of information for DCS to obtain records, sustain a legal source of income, follow recommendations from her assessments, maintain contact with DCS and update any changes to her contact information, and take parenting classes.

Nonetheless, Mother completed very few of the plan requirements. She also failed to provide documentation to corroborate her claims that she had completed other requirements. At the time of trial, Mother was admittedly living in an apartment that she claimed was her own; however, she never provided evidence that her name was on the lease. Mother claimed that she was able to gain employment, but she was unemployed at the time of trial. Mother testified at trial she had been incarcerated in February of 2023 and had multiple pending criminal charges for shoplifting. Finally, Mother tested positive for cocaine and THC as recently as March 2023, two months before the trial in this matter.

We agree with the trial court's conclusion that DCS proved this ground for termination by clear and convincing evidence, and we affirm.

## C. Persistent Conditions

Next, the trial court terminated Mother's rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Section (g)(3)(A) provides that termination may occur when

[t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a

safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at *20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). Additionally,

> this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *9 (Tenn. Ct. App. Nov. 9, 2021).

In the present case, the Children were removed from Mother's custody by a court order entered in a dependency and neglect action and have been in DCS custody since May 2021. We must determine whether conditions persist that prevent the safe return of the Children, whether the conditions are likely to be remedied at an early date, and whether a continued relationship with Mother prevents early integration of the Children into a stable, permanent home. Tenn. Code Ann. § 36-1-113(g)(3).

The trial court determined that the conditions underpinning the Children's removal persist and that there is little likelihood the Children can be safely returned to Mother. The trial court found, in pertinent part:

> The proof demonstrates that [Mother has] failed to complete the services required under the permanency plan that would have reunified [her] with the [C]hildren. Mother has not [] provided a stable income, followed the recommendations of the mental health assessment, the alcohol and drug assessment or the parenting assessment, or completed visitations with the [C]hildren. Mother has recently lost custody of another child due to a positive drug screen. . . .

> Mother [has] been arrested during the period of time the [C]hildren have been in foster care. [Mother has not] consistently maintained contact with the [C]hildren. Therefore, there is a lack of bond between [Mother] and [the C]hildren.

The evidence establishes by clear and convincing evidence that the issues which resulted in the removal of [the Children] from the legal and physical custody of [Mother] persist and in all probability would cause [the Children] to be subject to further abuse and/or neglect making it unlikely that the [C]hildren could return to [Mother] in the near future; there is little likelihood that these conditions will be remedied at an early date so [the Children] can be returned in the near future and the continuation of the parent/child relationship diminishes the chance of early integration into a stable and permanent home. . . .

The record does not preponderate against the trial court's findings.

Mother argues in her appellate brief that the initial reasons for removal no longer exist and have been remedied or will likely be remedied before the Children would return to her custody. Mother further contends that she has completed a number of tasks required by the permanency plan, has passed random drug tests, has not done drugs since 2017, has maintained stable housing for the last three years, and had consistent visits with the Children when they initially entered DCS custody. While it may be true that Mother completed a parenting assessment, a positive parenting class, and an alcohol and drug assessment, she did not follow the recommendations of those assessments and did not provide DCS with the pertinent information to verify her completion. Additionally, Mother recently lost custody of an additional child due to a positive drug screen. Moreover, during the time the Children have been in foster care, Mother was incarcerated for thirty-five days, and she has yet to provide the proper documentation to establish legal tenancy of her apartment. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) ("[C]onditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]"); *see also In re Daylan D.*, 2021 WL 5183087, at *9 ("[E]ven if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown."). Mother's argument is unavailing under the circumstances.

Finally, we also conclude that a continuing relationship with Mother impedes the Children's opportunity for integration into a safe, stable, and permanent home. The Children had been in foster care for over three years by the time of trial with little to no change in Mother's circumstances. Further, Mother recently tested positive for drugs, prompting DCS to remove an additional child from her custody just two months before trial. The Children made strides in foster care and had improved significantly by the time of trial. Foster Mother testified that if the Children were to be adopted, she would want to be the one to adopt them. Under the circumstances, the trial court did not err in concluding that the elements of section 36-1-113(g)(3) were proven by clear and convincing evidence.

The termination of Mother's parental rights for persistence of conditions is therefore affirmed.

## D. Failure to Manifest an Ability and Willingness to Assume Custody

The fourth ground for termination found by the trial court was failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. This ground applies when

[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second statutory prong,

[t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Here, the trial court found as follows regarding this ground:

> Neither parent at this time has manifested an ability or willingness to assume legal or physical custody or financial responsibility of the [C]hildren. [Mother] ha[s] not remedied the conditions that are reasonably related to the [C]hildren remaining in foster care for over three (3) years including the most basic responsibilities of maintaining safe, stable and appropriate housing, a stable source of income, and maintaining sobriety. Furthermore, placing the [C]hildren in [Mother's] legal and physical custody would pose a risk of substantial harm to the welfare of the [C]hildren. DCS has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(g)(14).

The record preponderates in favor of the trial court's factual findings as to this ground. We agree that clear and convincing evidence shows Mother lacks the ability to assume custody of the Children.

Mother has been incarcerated during the Children's time in DCS custody. While Mother testified that she loves the Children and desires that they have a relationship with their biological family, manifesting the "ability and willingness to assume legal and physical custody of a child must amount to more than mere words[,]" *In re Ken'bria B.*, No. W2017-01441-COA-R3-PT, 2018 WL 287175, at *10 (Tenn. Ct. App. Jan. 4, 2018), and "[c]riminal activity . . . raise[s] doubt as to a parent's actual willingness to assume custody or financial responsibility for the child." *In re Kaylene J.*, No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *17 (Tenn. Ct. App. May 26, 2021) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018)); *see also In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020) (noting that father's "willful disregard for authority frequently put him in a position where he was unable to care for" his children, supporting termination under section 36-1-113(g)(14)).

Additionally, the Children were removed from Mother's custody for nearly three years prior to trial. In that time, Mother has failed to produce documentation to establish her legal tenancy in her apartment, has not maintained her sobriety as she recently tested positive for THC and cocaine in March of 2023, and has not consistently visited with her Children so as to continue her relationship with Antonio P. and build a relationship with Au'brie P. At the time of trial, Mother had not maintained a stable source of income as she was unemployed due to her recent incarceration. Further, Mother never fully sought reinstatement of her visitation after it was suspended. While Mother expresses a desire for the Children to know their biological maternal family, she currently does not have custody of any of her eight biological children. Consequently, Mother's lifestyle and circumstances do not reflect the ability to assume custody of or financial responsibility for the Children.

- 14 -

Thus, DCS proved the first prong of section 36-1-113(g)(14) by clear and convincing evidence.

We are further troubled by Mother's behavior prior to having her visits suspended. The record reflects that Mother frequently erupted into verbal outbursts during videoconference visits and in meetings with the social worker. This behavior is consistent with Mother's behavior during trial, as reflected in the record, and calls into question Mother's ability to prioritize the Children's well-being. *See In re William B.*, No. M2020-01187-COA-R3-PT, 2021 WL 4935740, at \*23 (Tenn. Ct. App. Oct. 22, 2021) (concluding that a mother failed to manifest the ability and willingness to assume custody when the mother refused to address her mental health issues and her visitation was suspended because she could not behave in an appropriate manner). Moreover, despite her numerous positive drug tests, Mother adamantly maintains that she does not have a problem with drug use and that DCS has falsified one or more of her positive drug tests. Accordingly, Mother's lifestyle and circumstances are such that she is not able to safely parent the Children, nor does Mother seem to acknowledge that her behavior is problematic.

As to the second prong, we agree with the trial court that placing the Children in Mother's custody poses a risk of substantial harm to the Children. Mother has not seen the Children since the June 2021 virtual visit. By the time of trial, the Children were both three years old, and Foster Mother had been their primary caregiver for all of Au'brie P.'s life and most of Antonio P.'s life. Foster Mother testified that the Children participate in various therapies and refer to her as their mother. Under these circumstances, we readily agree with the trial court that removing the Children from their current setting poses a risk of substantial harm to their physical and psychological welfare.

Accordingly, we affirm the trial court's conclusion that DCS proved the elements of Tennessee Code Annotated section 36-1-113(g)(14) by clear and convincing evidence. The termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(14) is therefore affirmed.

## II.    Best Interests

In addition to proving at least one statutory ground for termination, DCS must prove by clear and convincing evidence that the Children's best interests are served by terminating Mother's parental rights. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is

not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective.").

When determining whether termination is in a child's best interests, we refer to the non-exclusive factors found at Tennessee Code Annotated section 36-1-113(i). The trial court correctly applied the relevant factors, reasoning as follows:

(1) **The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.**

The [C]hildren currently receive care that was not provided before they came into DCS custody. They have been in the same foster home since their removal and have built relationships with their foster family. This foster home is pre-adoptive and [Foster Mother] is willing to provide the continuity and stability the [C]hildren need.

(2) **The effect and change of caretakers and physical environment are likely to have on the child's emotional, physical, and mental condition.**

The [C]hildren have been in foster care for over three years now. They each have spent a significant part of their life with [Foster Mother] where they have overcome many issues. [Foster Mother] has provided the services needed for their emotional, physical, and mental wellbeing. Therefore, a change in caretakers and physical environment would be detrimental to their emotional, physical, and mental condition.

(3) **Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs.**

In this case, neither [P]arent has demonstrated continuity or stability. Both [P]arents have been in and out of jail during the period the [C]hildren have been in foster care. [Mother] additionally has not been able to keep a stable job and she has lost custody of an additional child based on a recent positive drug screen. . . . Neither [P]arent has shown the ability to take care of their own needs, better yet the [C]hildren's needs.

(4) **Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such an attachment.**

- 16 -

. . . Mother has not seen her [C]hildren for over two years due to her behavior at the last visit in June of 2021. Therefore, she no longer has the same bond that was originally with her [C]hildren. The likelihood of her creating that bond is low, especially with [Au'brie P.] who has been with [Foster Mother] since she was three days old.

(5) **Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child**.

. . . Mother has not had consistent visitation due to her behavior. . . . Therefore, a positive relationship with the [C]hildren is unlikely.

(6) **Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent.**

The [C]hildren have been with [Foster Mother] for almost their entire life. She has created a bond with the [C]hildren. The [C]hildren call her "mom". The [C]hildren have met [Foster Mother's] family members and have "aunts" and "uncles" and coworkers as their extended family.

(7) **Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner[.]**

Both [P]arents have been in and out of jail during the time the [C]hildren have been in foster care. . . . Mother has continued to test positive for illegal substances and has lost custody of another child since this case began. [Mother] ha[s] shown an inability to create a stable environment for the[] [C]hildren.

(8) **Whether the parent has taken advantage of the available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions[.]**

Neither Mother nor Father has completed their permanency plans which recommend various treatments. Mother completed some assessments;

however, she did not follow the recommendations of the evaluations. . . . Neither [P]arent has taken advantage of the available programs or community resources available to get their [C]hildren back.

(9) **Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstances, conduct, or conditions that made an award of custody unsafe and not in the child's best interest[.]**

Neither [P]arent has demonstrated a sense of urgency. The [C]hildren have been in foster care for over three (3) years. Neither [P]arent has addressed the steps of the permanency plan. Neither [P]arent has been able to complete the plan within the three (3) years the [C]hildren have been in the custody of DCS. Neither [P]arent has rendered the conditions that would make an award of custody safe for the [C]hildren.

(10) **Whether the parent has ever provided safe and stable care for the child or any other child[.]**

Mother has lost custody of several other of her [C]hildren. She has not been able to provide for a safe and stable environment for any of her [C]hildren. . . .

(11) **Whether the parent has demonstrated the commitment to creating and maintaining a home that meets the child's basic and specific needs in which the child can thrive[.]**

. . . Mother currently does not have stable housing. Therefore, neither [P]arent has demonstrated a commitment to creating and maintaining a home meeting the needs of the [C]hildren.

(12) **Whether the parent has consistently provided more than token financial support for the child[.]**

Neither [P]arent provided anything in regards of support for the [C]hildren, not even a token amount. Although Mother claims she was not aware of her duty to support, she should have known based on her previous involvement with DCS.

Having thoroughly reviewed the record, we conclude that it preponderates in favor of the trial court's above-quoted factual findings. Considered in the aggregate, these facts amount to clear and convincing evidence that terminating Mother's parental rights is in the

Children's best interests.  As such, we affirm the trial court's ultimate ruling that Mother's parental rights to the Children are terminated.

## CONCLUSION

We affirm the ruling of the Juvenile Court for Davidson County as to all issues, including the overall termination of Mother's parental rights, and the judgment of the trial court is affirmed.  Costs of this appeal are taxed to the appellant, Brittany S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE